**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|                                   |   |                     |
|-----------------------------------|---|---------------------|
| **TERENCE WILLIAMS,**             | * |                     |
| Plaintiff,                        | * |                     |
|                                   | * | Case No. PWG-16-4123|
| v.                                | * |                     |
| **DIMENSIONS HEALTH CORPORATION, INC.,** | * |                     |
| Defendant.                        | * |                     |

# MEMORANDUM OPINION AND ORDER

Following a rollover motor vehicle collision, Terence Williams was severely injured and brought to the emergency room at Prince George's County Hospital Center. Third Am. Compl. ¶ 10, ECF No. 18. He was screened by a physician assistant, given blood transfusions and, after two hours and forty minutes, brought to the operating room. But, ultimately, his legs had to be amputated. Williams filed suit against Defendant Dimensions Health Corporation, Inc. t/a Prince George's County Hospital Center (the "Hospital") in the Circuit Court for Prince George's County, alleging violations of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"). ECF No. 1.

The Hospital removed the case to this Court and then moved to dismiss Williams's complaint, which now is in its fourth iteration. Def.'s Mot., ECF No. 22.[1] In the Hospital's view, Williams "conflate[s] the requirements of EMTALA with traditional state medical

---

[1] The parties fully briefed the Motion. ECF Nos. 22-2, 23, 24. A hearing is not necessary. *See* Loc. R. 105.6.

negligence requirements." Def.s' Reply 2; *see also* Def.'s Mem. 9–10, 11. Williams attached exhibits to his opposition that were not previously attached to or referenced in his complaint, Med. Recs., ECF No. 23-5, and I have considered them in deciding the pending motion; accordingly, I will treat it as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). Because the exhibits belie Williams's assertion that he did not receive an appropriate screening, the Hospital is entitled to judgment as a matter of law on Williams's failure to screen claim. But, inasmuch as I cannot determine as a matter of law whether the Hospital failed to stabilize Williams before admitting him, I will deny the Hospital's motion as to that claim.

## Background

Williams was severely injured in a motor vehicle crash just after midnight on May 3, 2014. Third Am. Compl. ¶ 10. He "suffer[ed] from active exsanguination, mangled limbs, open fractures, severe pain, and pulse-less extremities." *Id.* ¶ 15. Emergency Medical Services reached him about a half hour later, designated his status as "Bravo," the second highest level of trauma, and alerted the Hospital, a Level II Trauma Center, that it would bring Williams to its emergency room. *Id.*

Williams arrived at the Hospital at 1:33 a.m. Four minutes later, he received an initial screening and evaluation from a physician assistant and "his status was upgraded from a Bravo to an Alpha code trauma patient, which meant he was suffering from a major trauma with multiple injuries thereby constituting an emergency medical condition." *Id.* ¶¶ 12–13; *see* Med. Recs. DHCMTD000015. "[T]he primary diagnosis listed on the emergency room records for Williams" is "hypovolemic shock." Third Am. Compl. ¶ 41; *see* Med. Recs. DHCMTD000008. Additionally, the physician assistant noted that he was "in severe distress." Third Am. Compl. ¶ 40. When the on-call trauma surgeon, Dr. Mohammad Ali Kahn, arrived at 1:53 a.m., twenty

2

minutes after Williams, *id.* ¶ 17, he "confirmed" the emergency medical condition that the physician assistant had identified, and noted that "Williams was suffering from: (a) Severe hypovolemic shock and massive bleeding from the arteries and extremities, (b) Massive soft tissue injury, (c) Vascular injury to the left extremity, [and] (d) Multiple open fractures to the extremities." *Id.* ¶¶ 71–72; *see* Med. Recs. DHCMTD000016. Dr. Kahn noted the "possibility that the patient's extremities may require amputation," as well as the "possibility that the patient may succumb to the multiple traumas." Med. Recs. DHCMTD000016. The Hospital does not dispute these allegations or the authenticity of the Medical Records and therefore, considered in the light most favorable to Williams, he was diagnosed as being in "severe distress" from "[s]evere hypovolemic shock and massive bleeding from the arteries and extremities," "[m]assive soft tissue injury," "[v]ascular injury," and "[m]ultiple open fractures." Third Am. Compl. ¶¶ 30–31, 71–72; *see* Med. Recs. DHCMTD000016.

The Hospital records indicate that he was supposed "to go immediately to the OR for vascular and orthopedic repair," but the surgical specialists were a "'no show' in the ER" and "extreme[ly] tard[y] in the OR." Third Am. Compl. ¶ 36; *see* Med. Recs. DHCMTD000022. He was therefore admitted to the Hospital's intensive care unit at 4:13 a.m. Williams claims that he was admitted "merely for 'observation,'" alleging that "[a]dmission for observation is an 'outpatient status' given to allow the doctor time to decide if the patient needs to be admitted as an inpatient or discharged; it is not a formal hospital inpatient admission." Third Am. Compl. ¶ 55. He claims that he was never admitted as an inpatient. *Id.* ¶ 59. But, the documents he attached to his opposition contradict his pleadings, showing an "Admit" date of May 3, 2014, and stating that Williams was an "INPATIENT – INTENSIVE CARE." Med. Recs.

DHCMTD000013. It is unclear, however, whether he was admitted only for observation at 4:13 a.m. and later admitted as an inpatient, or whether he was admitted as an inpatient at 4:13 a.m.

Williams was transported to the operating room at 4:15 a.m., with surgery scheduled for 4:24 a.m. Third Am. Compl. ¶¶ 48, 57. The on-call orthopedic and vascular surgeons arrived at 4:35 a.m. and surgery began at 5:13 a.m. *Id.* ¶ 61. By that time, "his lower extremities [had] become ischemic, gangrenous, and ultimately necrotic due to oxygen deprivation." *Id.* ¶ 62. One of the surgeons noted that Williams's open tibia was "bleeding very profusely" and that "the patient came in about 1:30 and by the time [the Hospital was] finally able to restore circulation due to a very complex destruction of his left lower extremity, a little over 6 hours had passed," and a "fasciotomy was deemed necessary to facilitate release of potential compartment syndrome, which was very likely given the duration of time since the injury." Med. Recs. DHCMTD000045.² After eleven days, on May 14, 2014, the Hospital transferred Williams to the University of Maryland Shock Trauma. Third Am. Compl. ¶ 93. "[U]ltimately . . . Williams['s] legs [had to] be[] amputated just to save his life." *Id.* ¶ 62. It is unclear from the record before me which facility performed the amputation.

## Standard of Review

The Hospital moves to dismiss pursuant to Rule 12(b)(6), under which Williams's pleadings are subject to dismissal if they "fail[ ] to state a claim upon which relief can be

---

² Compartment syndrome "describes increased pressure within a muscle compartment of the arm or leg. It is most often due to injury, such as fracture, that causes bleeding in a muscle, which then causes increased pressure in the muscle. This pressure increase causes nerve damage due to decreased blood supply." *See* https://www.medicinenet.com/compartment_syndrome/article.htm. A fasciotomy "is the only treatment for acute compartment syndrome. The muscle compartment is cut open to allow muscle tissue to swell, decrease pressure and restore blood flow. Complications may include . . . amputation . . . ." *Id.*; *see also* https://medical-dictionary.thefreedictionary.com/fasciotomy (defining fasciotomy as "a surgical procedure that cuts away the fascia to relieve tension or pressure").

4

granted." Fed. R. Civ. P. 12(b)(6). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

For purposes of considering a motion to dismiss, this Court accepts the facts alleged in the operative pleading as true. *See Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011). Williams attaches various documents to his opposition to support and augment his factual allegations. ECF Nos. 23-1 – 23- 9. Yet, an opposition to a dispositive motion is not a proper vehicle for amending a pleading. *See Dyer v. Oracle Corp.*, No. PWG-16-521, 2016 WL 7048943, at *7 (D. Md. Dec. 5, 2016); *Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015). Nonetheless, I may consider these documents if I treat the Hospital's motion as one for summary judgment, which I may do pursuant to Fed. R. Civ. P. 12(d). *See Syncrude Canada Ltd. v. Highland Consulting Grp., Inc.*, No. RDB-12-318, 2013 WL 139194, at *2 (D. Md. Jan. 10, 2013).

When a court converts a motion to dismiss to one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Notably, "the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion." *Ridgell v. Astrue*, DKC-10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012). Thus, this requirement "can be satisfied when [as here] a party is 'aware that material outside the pleadings is before the court.'" *Walker v. Univ. of Md. Med. Sys. Corp.*, No. CCB-12-3151, 2013 WL 2370442, at *3 (D. Md. May 30,

2013) (quoting *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985)). Indeed, while the Court "clearly has an obligation to notify parties regarding any court-instituted changes in the pending proceedings, [it] does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). And, "the fact that [a party] had attached other materials to its [briefing] should have alerted [the other party] to the possibility" that the Court would treat the motion as a motion for summary judgment. *Ridgell*, 2012 WL 707008, at *7; *see Laughlin*, 149 F.2d at 260–61. Here, the Hospital acknowledged the attached documents in its reply, demonstrating its awareness of them. *See* Def.'s Reply 1, 15–19. I will therefore treat the Hospital's motion as a motion for summary judgment. Accordingly, I consider the undisputed facts and take the disputed facts in the light most favorable to Williams as the non-moving party. *See White v. Pauly*, 137 S. Ct. 548, 550 (2017).

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Matherly v. Andrews*, 859 F.3d 264, 279, 280 (4th Cir. 2017). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251 (1986). Instead, the

evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

## Discussion

The Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), "imposes a 'limited duty on hospitals with emergency rooms to provide emergency care to all individuals who come there.'" *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996) (quoting *Brooks v. Md. Gen. Hosp., Inc.*, 996 F.2d 708, 715 (4th Cir. 1993)). Moreover, it "creates a private cause of action for '[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section.'" *Johnson v. Frederick Mem'l Hosp., Inc.*, No. WDQ-12-2312, 2013 WL 2149762, at *3 (D. Md. May 15, 2013) (quoting 42 U.S.C. § 1395dd(d)(2)(A)). Congress enacted this statute "to deal with the problem of patients being turned away from emergency rooms for non-medical reasons." *Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996). It is "commonly known as the 'Patient Anti–Dumping Act,'" because it "was enacted to prevent hospitals' suspected practice of 'dumping' patients who were unable to pay for care, either by refusing to provide basic emergency treatment ('failure to screen') or by transferring patients to other hospitals before the patients' conditions were sufficiently stabilized ('failure to stabilize')." *Johnson*, 2013 WL 2149762, at *3; *see also Vickers*, 78 F.3d at 142; *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994).

Importantly, EMTALA is intended to "eliminat[e] disparate treatment, not [to ensure] the correctness of the treatment," and therefore "[w]hether [a] [h]ospital properly cared for and treated [a] [p]laintiff is, if anything, a question left to state tort law." *Mullins v. Suburban Hosp. Healthcare Sys., Inc.*, No. PX-16-1113, 2017 WL 480755, at *5 (D. Md. Feb. 6, 2017) (citing

7

*Vickers*, 78 F.3d at 143); *see also Johnson*, 2013 WL 2149762, at *4 ("The Act's proscriptions apply solely to 'a hospital's disparate treatment of—or its total failure to treat—an individual in need of emergency medical care.'" (quoting *Bergwall v. MGH Health Servs., Inc.*, 243 F. Supp. 2d 364, 370 (D. Md. 2002))). The Fourth Circuit and this Court have emphasized repeatedly that "EMTALA is a limited 'anti-dumping' statute, not a federal malpractice statute." *Mullins*, 2017 WL 480755, at *4 (citing *Bryan*, 95 F.3d at 351); *see also Vickers*, 78 F.3d at 143 (noting the Fourth Circuit's "repeated admonition that EMTALA not be used as a surrogate for traditional state claims of medical malpractice"); *Power*, 42 F.3d at 856 ("EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence."); *Brooks*, 996 F.2d at 710 ("The Act was not designed to provide a federal remedy for misdiagnosis or general malpractice."); *Baber v. Hospital Corp.*, 977 F.2d 872, 880 (4th Cir. 1992) ("EMTALA is no substitute for state law medical malpractice actions."). Indeed, "construing EMTALA to reach claims sounding in medical malpractice 'would eviscerate any distinction between EMTALA actions and state law actions for negligent treatment and misdiagnosis.'" *Mullins*, 2017 WL 480755, at *5 (quoting *Vickers*, 78 F.3d at 141). The federal statute "is not intended to duplicate preexisting legal protections, but rather to create a new cause of action, generally unavailable under state tort law." *Johnson*, 2013 WL 2149762, at *4 (quoting *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991)).

Thus, EMTALA imposes only "a limited duty on hospitals with emergency rooms to provide emergency care to all individuals who come there." *Brooks*, 996 F.2d at 714–15. The required care has two components. *Johnson*, 2013 WL 2149762, at *3. Initially, "when a person seeks treatment at a hospital's emergency room, the hospital must provide 'an appropriate

medical screening examination' to determine whether an 'emergency medical condition' exists," and then, "if the screening reveals the presence of an emergency medical condition, the hospital must either provide the medical examination and treatment necessary to 'stabilize' the condition, or transfer the person to another medical facility." *Id.* (quoting 42 U.S.C. § 1395dd(a), (b)(1))) (footnotes omitted); *see also Vickers*, 78 F.3d at 142; *Williams v. United States*, 242 F.3d 169, 173–74 (4th Cir. 2001).

### *Failure to Screen*

With regard to medical screening, EMTALA provides that, if a hospital has "a hospital emergency department,"[3] then

> if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists.

42 U.S.C. § 1395dd(a). EMTALA defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . serious impairment to bodily functions, or . . . serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A). A "medical screening examination is 'appropriate' if it is designed to identify acute and severe symptoms that alert the physician of the need for *immediate* medical attention to prevent serious bodily injury." *Johnson v. Frederick Mem'l Hosp., Inc.*, No. WDQ-12-2312, 2013 WL 2149762, at *4 (D. Md. May 15, 2013) (quoting *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1257 (9th Cir. 1995) (emphasis in original)).

---

[3] Williams asserts, and the Hospital does not dispute, that the Hospital is subject to EMTALA. *See* Third Am. Compl. ¶ 4.

9

Here, Williams arrived at the Hospital already designated as "Bravo," the second highest level of trauma; a physician assistant performed his "initial screening and evaluation" and determined that he need to go "[t]o OR urgently"; he was upgraded to "Alpha" within minutes, which meant that his condition "constitute[d] an emergency medical condition"; and when Dr. Kahn arrived, twenty minutes after Williams, the physician assistant "discussed Williams' condition with Dr. Kahn." Third Am. Compl. ¶¶ 10, 12, 14, 36, 43; *see also* Med. Recs. DHCMTD000008, 15, 16, 22. Thus, he was screened, and it appears that the screening was appropriate, as it "identif[ied] acute and severe symptoms" and "alert[ed] the physician of the need for *immediate* medical attention to prevent serious bodily injury." *See Johnson*, 2013 WL 2149762, at *4.

Yet, as Williams see it, the screening was not appropriate, because it did not comply with hospital policy and State law, and therefore the Hospital violated EMTALA. *See* Third Am. Compl. ¶¶ 15, 46; Pl.'s Opp'n 2, 3, 22. Certainly, an EMTALA claim for failure to screen may be based on an allegation that a plaintiff was "not screened, or if screened, *that the screening differed markedly from that provided other patients*." *Johnson*, 2013 WL 2149762, at *4 (quoting *Money v. Banner Health*, No. 11-800-LRH-WGC, 2012 WL 1190858, at *8 (D. Nev. Apr. 9, 2012) (emphasis added)).

> Inasmuch as the heart of an EMTALA claim is unequal treatment between similarly symptomatic patients, in order to comply with the screening requirements § 1395dd(a), a hospital must " 'apply uniform screening procedures to all individuals coming to the emergency room,' " including routinely available ancillary services. So long as the hospital has offered an emergency patient all its standard medical screening procedures, once the emergency department staff has determined that an emergency medical condition is or is not present, its obligation under Section 1395dd(a) ends. The hospital's procedures need not be identical to what would be performed in other facilities, but rather are unique to each individual facility. ... Accordingly, *the question is whether [the hospital] followed its own standard screening procedures when it initially screened [the patient]*.

10

*Bergwall v. MGH Health Servs., Inc.*, 243 F. Supp. 2d 364, 371–72 (D. Md. 2002) (quoting *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 143 (4th Cir. 1996) (internal citations omitted)) (emphasis added); *see, e.g.*, *Vickers*, 78 F.3d at 143 (concluding that patient did not state a claim based on receiving less treatment than others with "same medical condition" because, simply put, he was misdiagnosed, and he received the appropriate treatment for someone with the diagnosis he received); *Barber*, 977 F.2d at 878–79 (concluding that plaintiff could not state a claim based on his erroneous belief that medical screening is only "'appropriate' if it satisfies a national standard of care" and could not otherwise state a claim for failure to screen because he "failed to show no screening was provided to his sister," claiming instead only that the doctor "did not do enough accurately to diagnose her condition"); *Johnson*, 2013 WL 2149762, at *4 (dismissing plaintiffs' failure to screen claim because they failed to allege that the hospital "failed to screen Charles Johnson, or screened him differently from patients presenting like conditions").

As noted, Williams concedes that he was screened, but claims that a physician assistant performed the screening, whereas "an appropriate medical screening examination . . . required that he be seen by a licensed and on-call trauma surgeon or emergency room attending physician." Third Am. Compl. ¶ 15; *see* Pl.'s Opp'n 2, 3, 22. He claims that "hospital policy and State law required him to be screened and/or treated by orthopedic, trauma and vascular surgeons within 30 minutes—just as any other patient presented to [the Hospital] with the same or similar symptoms or condition . . . ." Third Am. Compl. ¶ 46. Williams also claims that, "[a]ccording to hospital policy and State law, the *maximum* acceptable response time for an on-call trauma surgeon in a Level II trauma center is '*within*' 15 minutes; and the maximum acceptable response time for specialty surgeons, such as the on-call orthopedic and vascular surgeons, is

*within* 30 [minutes]," *id* ¶ 16, yet the on-call trauma surgeon, Dr. Kahn, arrived five minutes late and the on-call orthopedic and vascular surgeons never arrived, *id.* ¶¶ 23–24. He argues that the Hospital was required by the State to have a "[t]rauma surgeon available in the hospital at *all times*" because it was a "Level II Trauma Center." Pl.'s Opp'n 16–17.

To the extent that Williams bases his claim on a failure to comply with State law, he is mistaken. State law requirements are not relevant to an EMTALA claim, as a hospital's performance is measured only against its own screening procedures. *See Bergwall*, 243 F. Supp. 2d at 372; *see also Mullins v. Suburban Hosp. Healthcare Sys., Inc.*, No. PX-16-1113, 2017 WL 480755, at *5 (D. Md. Feb. 6, 2017); *Johnson*, 2013 WL 2149762, at *4. Stated differently, the question is whether the Hospital followed its *own* procedures, not whether it followed the proper procedures. *See Bergwall*, 243 F. Supp. 2d at 371–72.

As for hospital policy, the Hospital's On-Call Coverage Memorandum states:

> All patients who present to the Emergency Department requesting treatment will receive a medical screening exam (MSE) to determine if an emergency medical condition exists. The MSE may be performed by the physician, *physician extender*, or Ob/Gyn provider as determined by the patient's presenting complaint. . . .
>
> In trauma cases, the traumatologist on-call will be responsible for determining which, if any, other specialties are to be called, and at what point in the patient's care they are to be called.

On-Call Mem. § 4, ECF No. 23-2. A "physician extender" is "a health care provider who is not a physician but who performs medical activities typically performed by a physician. It is most commonly a nurse practitioner or physician assistant." *See* https://medical-dictionary.thefreedictionary.com/physician+extender. Thus, contrary to Williams's pleadings, a physician assistant may perform the medical screening exam under the Hospital's policy. *See* On-Call Mem. § 4.

Insofar as the policy requires a physician to be involved in the initial determinations, *see id.*; *see also* Trauma Resp. Plan § 5.3, ECF No. 23-1 ("The ED [Emergency Department] Charge Nurse/designee, will in consultation with the on-duty ED Physician, assign the patient as an 'ALPHA' or 'BRAVO' Trauma."), the On-Call Coverage Memorandum also provides that "[a] physician who is listed on an on-call roster must respond to a call, either by phone or in person, within 30 minutes of the call," On-Call Mem. § J. Thus, contrary to Williams's assertion that Dr. Kahn, who was on-call, had to arrive within fifteen minutes, an on-call physician had thirty minutes to respond. *See id.* It is undisputed that Dr. Kahn arrived after only twenty minutes, which is well within the thirty minute window. Third Am. Compl. ¶ 25. And, in any event, the physicians' arrival did not impact the initial screening, which a physician assistant could perform. *See* On-Call Mem. § 4. Similarly, insofar as Williams alleges that "an attending ER doctor was required to be at [his] bedside to provide constant screening and management of his care until Dr. Khan's arrival," Third Am. Compl. ¶ 23, the Hospital documents he attaches contain no such requirement.

Moreover, the Hospital's EMTALA Policy states that a medical screening evaluation "is conducted within the capabilities of the Hospital's Emergency Department, including ancillary services routinely available to the Emergency Department," and that "[t]he exam must be performed by the physician or other qualified medical . . . personnel"; it defines qualified medical personnel to include a physician assistant, who "may perform the medical screening examination and review the findings with a physician." EMTALA Policy 3, ECF No. 23-4. It is undisputed that the physician assistant performed the initial screening and "discussed Williams' condition with Dr. Kahn." Third Am. Compl. ¶¶ 13, 43. Therefore, the Hospital followed its own standard screening procedures when it provided an initial screening for Williams. Whatever

13

shortcomings Williams may perceive in the physician assistant's screening or the physicians' involvement, those are matters for a medical malpractice action, and outside the scope of an EMTALA action. *See Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994); *Brooks v. Md. Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir. 1993). Accordingly, Williams cannot show that the Hospital violated EMATALA's screening requirement. *See Bergwall*, 243 F. Supp. 2d at 371–72. The Hospital is entitled to judgment as a matter of law on Williams's failure to screen claim.[4]

*Failure to Stabilize*

With regard to stabilizing emergency medical conditions, EMTALA provides that, once a hospital determines that an individual has an emergency medical condition,

> the hospital must provide either--
>
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility [after the individual is stabilized or consents, or a physician or qualified medical person signs off].

42 U.S.C. § 1395dd(b)(1). The stabilization required depends on "the actual diagnosis of the patient's condition, even if that diagnosis was in fact erroneous," rather than "the correct diagnosis of the patient's condition." *Bergwall v. MGH Health Servs., Inc.*, 243 F. Supp. 2d 364, 374 (D. Md. 2002).

It is clear that the Hospital admitted Williams prior to transferring him. Therefore, it was obligated under EMTALA to stabilize his diagnosed condition until it admitted him, after which

---

[4] I note that the Medical Records list "Blue Cross Blue Shield" insurance as the form of payment. DHCMTD000008. Thus, Williams was not one of the patients EMTALA was designed to protect from being "dumped" for being unable to pay for emergency care. *See Vickers*, 78 F.3d at 142; *Power*, 42 F.3d at 856; *Johnson*, 2013 WL 2149762, at *3

point medical malpractice law governed its further obligations. *See* 42 C.F.R. § 489.24(a)(1)(ii) ("If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section."); 42 C.F.R. § 489.24(d)(2)(i) ("If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual."); *see also Bryan v. Rectors & Visitors of Univ. of Virginia*, 95 F.3d 349, 350 (4th Cir. 1996) (no duty to stabilize under EMTALA after patient is "admit[ted] for treatment of [his] emergency condition"); *Johnson v. Frederick Mem'l Hosp., Inc.*, No. WDQ-12-2312, 2013 WL 2149762, at *5 (D. Md. May 15, 2013) (quoting § 489.24(a)(1)(ii), (d)(2)(i)). The requirement is for "limited stabilizing treatment," that is, "immediate, emergency stabilizing treatment with appropriate follow-up." *Bryan*, 95 F.3d at 351. Indeed,

> the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting [him] for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment.

*Id.* at 352. Thus, the issue is whether he received the necessary examination and treatment to stabilize the emergency medical condition that the Hospital identified (hypovolemic shock, massive bleeding, massive soft tissue injury, vascular injury, and open fractures, severe distress) until he was admitted at some point on May 3, 2014.

EMTALA defines stabilize as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a

15

facility." 42 U.S.C. § 1395dd(e)(3)(A). The Fourth Circuit has interpreted this statute to apply even when a patient is not transferred. *In re Baby K*, 16 F.3d 590, 597–98 (4th Cir. 1994) (rejecting hospital's argument that "EMTALA only applies to patients who are transferred from a hospital in an unstable condition"; reasoning that "[t]he use of the word 'transfer' to describe the duty of a hospital to provide stabilizing treatment evinces a Congressional intent to require stabilization prior to discharge or that treatment necessary to prevent material deterioration of the patient's condition during transfer" and "was not intended to allow hospitals and physicians to avoid liability under EMTALA by accepting and screening a patient and then refusing to treat the patient because the patient cannot or will not be transferred"). Therefore, until a patient is transferred, discharged, or admitted, "the Hospital must provide that treatment necessary to prevent the material deterioration of each patient's emergency medical condition." *Id.* at 596.

This is not a requirement to "treat[] the patient's emergency medical condition in full" or "fully cure the patient's ailment before moving or discharging [him]." *Bergwall*, 243 F. Supp. 2d at 374. The court "determin[es] whether an individual was properly stabilized [based on] "the patient's condition at the time of the transfer or discharge [or admission]," not with the benefit of hindsight. *Id.* at 374–75.

*Smithson v. Tenet Health System Hospitals, Inc.*, No. 07-3953, 2008 WL 2977361, at *5 (E.D. La. July 30, 2008), although not controlling authority, is informative nonetheless. There, the plaintiff had an "open globe injury," that is, an injury to his eye. *Id.* at *1. The on-call ophthalmology consultant informed the plaintiff that "he needed surgery for urgent repair," but the defendant hospital then transferred him without providing the surgery. *Id.* At the second hospital, "the doctors detected an infection in Smithson's eye, and three days later, his eye was removed." *Id.* His "experts suggest[ed] that surgery was the only means of stabilizing an open

16

globe injury," and that "any delay in treatment of an open globe would 'result in loss of tissue' and 'progressively increase the risk of infection.'" *Id.* at *5. And, one of the plaintiff's experts "testified that plaintiff did not receive stabilizing treatment before his transfer and that the delay involved in transfer contributed to the condition that caused the loss of plaintiff's eye." *Id.* Yet his treating physician "testified that plaintiff was stable prior to transfer, and that no material deterioration of his condition was likely to result from the transfer." *Id.* The court concluded that a genuine dispute of material fact existed regarding whether the plaintiff was stabilized when he was transferred, and therefore neither party was entitled to summary judgment. *Id.* Thus, a failure to provide necessary surgery may result in a failure to stabilize. *See id.*; *see also St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 689 (10th Cir. 2002) (noting that surgery was "required for further stabilization"); *Lozoya v. Anderson*, No. 07CV2148-IEG-WMC, 2008 WL 2476187, at *3 (S.D. Cal. June 17, 2008) (denying motion to dismiss where plaintiff alleged that defendants gave her "a sling and medication for the pain," rather than the "orthopedic consult and open reduction surgery" that her condition required" and it was "premature to decide whether the sling and painkillers constituted the treatment 'necessary to assure within reasonable medical probability, that no material deterioration of the condition [was] likely to result from or occur during the transfer [or discharge] of the individual from a facility'").

Here, Williams acknowledges that, during his first thirty-two minutes in the emergency room, he was intubated; he received blood transfusions; and a diagnostic peritoneal aspiration, a mini-laparotomy, and diagnostic lab work were performed, and he provided confirming medical records. Third Am. Compl. ¶¶ 21, 26, 32, 34; Med. Recs. He also acknowledges that his "continue[d] resuscitation [of blood and blood products] was done until the vascular surgery

17

team was available to the OR." Third Am. Compl. ¶ 35; *see* Med. Recs. DHCMTD000016. But, according to Williams, "resuscitation . . . is a temporary, medically necessary, life-saving intervention." Third Am. Compl. ¶ 35. And, he claims that the "procedures were performed on Williams while conscious and without a sedative to induce sleep and numb the pain." *Id.* ¶ 26. In Williams's view, none of this constituted "treatment" for his emergency medical condition. *Id.* ¶¶ 27, 35.

Additionally, he claims that "the plan" was for him "to go immediately to the OR for vascular and orthopedic repair; it was just that the plan was foiled due to the inordinate and unjustified delay caused by the surgical specialists' 'no show' in the ER coupled with their extreme tardiness in the OR." *Id.* ¶ 36. Until the surgery was completed almost eleven hours after Williams arrived in the emergency room, "Williams was still 'persistent[ly]' bleeding." *Id.* ¶ 66. Williams alleges that the delay "caused his lower extremities to become ischemic, gangrenous, and ultimately necrotic due to oxygen deprivation," and "ultimately required [his] legs being amputated just to save his life." *Id.* ¶ 62.

In short, the pleadings allege and the medical records show that, despite the measures the Hospital took, Williams continued to bleed from his injuries for more than eleven hours after his arrival and, in the end, his legs had to be amputated. At some point (but no earlier than 4:13 a.m., shortly before surgery began), Williams was admitted to the Hospital. Thus, he has stated a claim for failure to stabilize, given that it is plausible that the Hospital failed to stabilize his emergency medical condition before it admitted him, such that his condition materially deteriorated.

Moreover, on the record currently before me, neither the time Williams was admitted as an inpatient nor his status at that time is established. Nor has the Hospital established that the

18

care provided to Williams was sufficient to stabilize him without performing surgery sooner. Thus, I cannot determine as a matter of law that the Hospital fulfilled its statutory obligation to stabilize Williams until he was admitted. *See In re Baby K*, 16 F.3d at 597–98; *Bergwall*, 243 F. Supp. 2d at 374–75. It may be that the Hospital's failure to perform surgery sooner led to the amputation. *See St. Anthony Hosp.*, 309 F.3d at 689; *Smithson*, 2008 WL 2977361, at *5; *Lozoya*, 2008 WL 2476187, at *3. Or, it may be that Williams was stable when admitted and that the loss of his legs was unavoidable, as Dr. Kahn predicted could be the case, or due to medical negligence after his admission, outside the scope of EMTALA. *See Power*, 42 F.3d at 856; *Brooks*, 996 F.2d at 710. Consequently, the Hospital's motion, construed as a motion for summary judgment, is denied without prejudice with regard to the EMTALA claim for failure to stabilize.

## ORDER

Accordingly, it is, this 27th day of November, 2017, hereby ORDERED that

1. The Hospital's motion, ECF No. 22, treated as a motion for summary judgment, is granted in part and denied in part, as follows:

    a. Judgment in the Hospital's favor is granted on Williams's EMTALA claim for failure to screen; and

    b. The motion is denied without prejudice as to Williams's EMTALA claim for failure to stabilize.

2. The Hospital's answer is due on or before December 12, 2017.

/S/
Paul W. Grimm
United States District Judge
