# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| **TERENCE WILLIAMS,** | * | |
| Plaintiff, | * | |
| v. | * | Case No. PWG-16-4123 |
| **DIMENSIONS HEALTH CORPORATION, INC.,** | * | |
| Defendant. | * | |

## MEMORANDUM OPINION AND ORDER

Terence Williams was severely injured in a rollover motor vehicle collision and brought to Prince George's County Hospital Center, a Level II Trauma Center. Def.'s Mem. 1, ECF No. 34-1; Pl.'s Opp'n 2, ECF No. 44. Prince George's County Hospital Center screened him; performed "resuscitative and diagnostic procedures" including "[b]lood transfusions, performing a cut-down to place a Quinton catheter, endotracheal intubation, diagnostic peritoneal aspiration (DPA), and blood draws for labs"; operated on him approximately three hours and forty minutes after his arrival; admitted him as an inpatient; and treated him for eleven days, including performing additional surgical procedures, before transferring him to University of Maryland Medical System. Pl.'s Opp'n 4, 6, 12, 15, 17; Def.'s Mem. 2–8; *Williams v. Dimensions Health Corp., Inc.*, No. PWG-16-4123, 2017 WL 5668217, at *1, *2 (D. Md. Nov. 27, 2017). Despite the extensive treatment, Williams had to have both of his legs amputated due to his injuries. Def.'s Mem. 20; Pl.'s Opp'n 13.

Believing that he was not screened appropriately nor ever admitted to Prince George's County Hospital Center and that the tissue ischemia and tissue death he suffered in his lower limbs following the accident could have been minimized had he had surgery sooner or been transferred promptly to a Level I Trauma Facility, Williams filed suit against Defendant Dimensions Health Corporation, Inc. t/a Prince George's County Hospital Center ("PGHC" or the "Hospital"). ECF No. 2. He alleged that the Hospital's failure to perform surgery promptly amounted to a failure to provide stabilizing treatment for his emergency medical condition in violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"); he also alleged that the Hospital's failure to screen him appropriately violated EMTALA. *Id.*[1]

The Hospital filed a motion to dismiss, ECF No. 22, which I construed as one for summary judgment because Williams filed exhibits to support his position and I relied on those exhibits in ruling on the motion. I granted summary judgment in the Hospital's favor on Williams's failure to screen claim because the parties' exhibits demonstrated that Williams received an appropriate screening. *Williams*, 2017 WL 5668217, at *1. With regard to Williams's failure to stabilize claim, the Hospital focused on the extensive care that Williams conceded he had received, arguing that Williams could not state an EMTALA claim based on his belief that "the stabilization efforts were inadequate and immediate transfer of the patient to UMMS was a more appropriate course of action," as "a medical negligence claim and not EMTALA is the appropriate cause of action to pursue" for such allegations. Def.'s Mem. in Support of Mot. to Dismiss 9, 12–13, ECF No. 22-2; *see also* Def.'s Reply in Support of Mot. to

---

[1] Williams also separately filed a medical malpractice suit in state court. *See* Def.'s Mem. 9; *Williams v. Dimensions Health Corp., Inc.*, Case No. CAL 17-35481 (Cir. Ct. Prince George's Cty., Md., filed Nov. 14, 2017).

Dismiss 12, ECF No. 24. Notably, the Hospital—arguing for dismissal and therefore not relying on the exhibits (which showed that Williams had been admitted, contrary to his allegations)—did not assert that Williams's admission to the Hospital barred his recovery under EMTALA.

Williams countered that, despite the treatment it provided to him, the Hospital failed to meet the stabilization requirements of EMTALA because it allowed his "conditions to materially deteriorate" by not performing surgery promptly. Pl.'s Opp'n to Mot. to Dismiss 25–28, ECF No. 23. I noted the well-established law that state medical malpractice law governs treatment after a patient is admitted, and a patient cannot bring an EMTALA claim based on care received after admission. *Williams*, 2017 WL 5668217, at \*7 (citing, *e.g.*, *Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 350–51 (4th Cir. 1996)). Because I could not determine on the record before me at that time when Williams was admitted and whether the Hospital failed to stabilize Williams before admitting him, I denied the motion as to Williams's failure to stabilize claim. *Id.*

The Hospital has filed a second dispositive motion, ECF No. 34, now insisting that Williams's admission to the Hospital bars his recovery under EMTALA. Def.'s Mem. 13, ECF No. 34-1; Def.'s Reply 1–2, ECF No. 47.[2] Williams continues to argue that he never was admitted prior to transfer, Pl.'s Opp'n 6, and still I cannot determine on the record before me when precisely Williams was admitted. Yet, the record establishes that there is no genuine dispute that, at some point on May 3, 2014, he *was* admitted as an inpatient. *Williams*, 2017 WL 5668217, at \*2 (noting that the Medical Records that Williams filed with his opposition to the

---

[2] The parties fully and skillfully briefed the Motion. ECF Nos. 34-1, 44, 47. A hearing is not necessary. *See* Loc. R. 105.6.

Hospital's first dispositive motion "show[] an 'Admit' date of May 3, 2014, and stat[e] that Williams was an "INPATIENT – INTENSIVE CARE"; citing Med. Recs. DHCMTD000013).

Further, the Hospital's briefing, as well as my additional, independent research, makes clear that "admission of an individual as an inpatient is a complete defense to an EMTALA failure-to-stabilize claim, provided that the hospital does so in good faith in order to stabilize the emergency condition." *Morgan v. N. Miss. Med. Ctr., Inc.*, 458 F. Supp. 2d 1341, 1350 (S.D. Ala. 2006), *aff'd*, 225 F. App'x 828 (11th Cir. 2007); *see* 42 C.F.R. § 489.24(d)(2)(i); *Bryan*, 95 F.3d at 351. Thus, contrary to my understanding when I considered the parties' arguments for the Hospital's first dispositive motion, "[t]he patient's admission to the hospital is essential to this court's decision—the time of admission is not." *Ceballos-Germosen v. Doctor's Hosp. Ctr. Manati*, 62 F. Supp. 3d 224, 232 (D.P.R. 2014). Because Williams was admitted and has not shown that his admission was not in good faith, I will grant the Hospital's Motion for Summary Judgment and close this case.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Matherly v. Andrews*, 859 F.3d 264, 279, 280 (4th Cir. 2017). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10

(1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

## Discussion

State medical malpractice law does not provide a cause of action against a medical provider for "failure to treat," such that hospitals can, without fear of repercussions under state tort law, turn away patients who cannot afford care. *Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996). Recognizing this void in the law more than thirty years ago, Congress "expressed concern that hospitals were abandoning the longstanding practice of providing emergency care to all due to increasing pressures to lower costs and maximize efficiency." *Brooks v. Md. Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir. 1993). To ensure that hospitals were not "'dumping' patients unable to pay, by either refusing to provide medical treatment or transferring patients before their emergency conditions were stabilized," Congress enacted the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), in 1986. *Brooks*, 996 F.2d at 710; *see Bryan*, 95 F.3d at 351 (noting that Congress enacted EMTALA "to deal with the problem of patients being turned away from emergency rooms for non-medical reasons"). The statute "imposes a 'limited duty on hospitals with emergency rooms to provide emergency care to all individuals who come there.'" *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996) (quoting *Brooks*, 996 F.2d at 715). And, relevantly here, it "creates a private cause of action for '[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section.'"

*Johnson v. Frederick Mem'l Hosp., Inc.*, No. WDQ-12-2312, 2013 WL 2149762, at *3 (D. Md. May 15, 2013) (quoting 42 U.S.C. § 1395dd(d)(2)(A)).

EMTALA's passage did not "duplicate preexisting legal protections, but rather . . . create[d] a new cause of action, generally unavailable under state tort law." *Johnson*, 2013 WL 2149762, at *4 (quoting *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991)). Stated differently, "EMTALA is a limited 'anti-dumping' statute, not a federal malpractice statute," and it does not ensure "the correctness of the treatment." *Mullins v. Suburban Hosp. Healthcare Sys., Inc.*, No. PX-16-1113, 2017 WL 480755, at *4, *5 (D. Md. Feb. 6, 2017) (citing *Bryan*, 95 F.3d at 351); *see also Vickers*, 78 F.3d at 143; *Brooks*, 996 F.2d at 710; *Baber v. Hospital Corp.*, 977 F.2d 872, 880 (4th Cir. 1992). Therefore, "[w]hether [a] [h]ospital properly cared for and treated [a] [p]laintiff is, if anything, a question left to state tort law." *Mullins*, 2017 WL 480755, at *5 (citing *Vickers*, 78 F.3d at 143); *see also Johnson*, 2013 WL 2149762, at *4; *Bergwall v. MGH Health Servs., Inc.*, 243 F. Supp. 2d 364, 370 (D. Md. 2002).

Pursuant to EMTALA, if an emergency medical condition exists, the hospital must "stabilize the condition or, if medically warranted, . . . transfer the person to another facility if the benefits of transfer outweigh its risks."[3] *Brooks*, 996 F.2d at 710; *see* 42 U.S.C. § 1395dd(b)(1). A hospital stabilizes a patient when it "provide[s] such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material

---

[3] EMTALA does not cover all hospitals, and it does not provide a cause of action against the individual medical providers. *See* 42 U.S.C. § 1395dd(d)(1)(A), (e)(2). In this case, however, it is undisputed that the Hospital, the sole defendant, is covered. *See Williams*, 2017 WL 5668217, at *4 n.3. EMTALA also requires the hospital to "provide to anyone presented for treatment 'an appropriate medical screening . . . to determine whether or not an emergency medical condition . . . exists.'" *Brooks*, 996 F.2d at 710 (quoting 42 U.S.C. § 1395dd(a)). As noted, I already determined that the Hospital fulfilled its obligation to provide an appropriate medical screening. *See Williams*, 2017 WL 5668217, at *1.

6

deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). Although the statute defines stabilization in terms of transfer, it obligates a hospital to stabilize a patient even if it is not transferring the patient. *In re Baby K*, 16 F.3d 590, 597–98 (4th Cir. 1994). That is, EMTALA also "require[s] stabilization prior to discharge." *Id.*

Significantly, when, instead of discharging or transferring a patient, a "hospital admits the individual as an inpatient for further treatment, the hospital's obligation under [EMTALA] ends." 42 C.F.R. § 489.24(a)(1)(ii); *see Leimbach v. Hawaii Pac. Health*, No. 14-246 JMS, 2015 WL 4488384, at *11 (D. Haw. July 22, 2015) ("[A]ny EMTALA requirement to transfer Plaintiff ended when he was admitted to WMH." (citing *Bryant v. Adventist Health Sys. N.*, 289 F.3d 1162, 1168 (9th Cir. 2002))). Thus, if a hospital finds that an individual has an emergency medical condition and then "admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, *the hospital has satisfied its special responsibilities under this section with respect to that individual.*" 42 C.F.R. § 489.24(d)(2)(i) (emphasis added); *see also Johnson v. Frederick Mem'l Hosp., Inc.*, No. WDQ-12-2312, 2013 WL 2149762, at *5 (D. Md. May 15, 2013) ("[A] hospital need not stabilize a patient who, although experiencing a medical emergency, has been admitted for treatment."). Notably, "[a] hospital's EMTALA obligation ends when the individual has been admitted in good faith for inpatient hospital services whether or not the individual has been stabilized." CMS State Operations Manual, Appendix V – Interpretive Guidelines – Responsibilities of Medicare Participating Hospitals in Emergency Cases 53, *available at* https://www.cms.gov/Regulations-and-Guidance/Legislation/EMTALA/index.html.

The Fourth Circuit most recently considered EMTALA's stabilization requirement in *Bryan v. Rectors & Visitors of University of Virginia*, 95 F.3d 349 (4th Cir. 1996).[4] There, the University of Virginia's hospital "treated Mrs. Robertson for an emergency condition for twelve days," then "determined pursuant to its internal procedures that no further efforts to prevent her death should be made and then eight days later, when Mrs. Robertson faced a life-threatening episode, . . . allowed her to die." *Id.* at 350. Her estate filed an EMTALA action against the university, and the district court dismissed the failure to stabilize claim, holding that "the Act imposes no obligations on a hospital once the hospital has admitted the patient." *Id.* at 349–50. It reasoned that "Mrs. Robertson had been admitted to the hospital long before the occurrence of the hospital's alleged misdeeds." *Id.* at 350.

The Fourth Circuit affirmed "on somewhat different grounds than those relied upon by the district court," rejecting the estate's argument that "EMTALA imposed upon the hospital an obligation not only to admit Mrs. Robertson for treatment of her emergency condition, which concededly was done, but thereafter continuously to 'stabilize' her condition, no matter how long treatment was required to maintain that condition." *Id.* The appellate court noted that EMTALA's "core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat," and that "Congress's sole purpose in enacting EMTALA was to deal with the problem of patients being turned away from emergency rooms for non-medical reasons." *Id.* at 351.

---

[4] More recently, in *Williams v. United States*, the Fourth Circuit noted that "EMTALA imposes a duty on any participating hospital to provide emergency medical care generally," but in the case before it, the plaintiff sued the United States based on its operation of an Indian hospital, and "this duty is restricted in the case of Indian hospitals operating under the Indian Health Care Improvement Act, 25 U.S.C. § 1601 *et seq.,* by the express terms of that Act." 242 F.3d 169, 174 (4th Cir. 2001). Thus, the Fourth Circuit did not address the duty to stabilize further.

8

The court stated that "the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment." *Id*. at 352. It observed that, once the hospital "undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians" under state malpractice law, and any subsequent "refusal of treatment after the establishment of a physician-patient relationship would be regulated by the tort law of the several states." *Id*. at 351. The appellate court affirmed the dismissal, reasoning that the "complaint allege[d] no EMTALA violation on the part of the hospital at any time before Mrs. Robertson had been in the hospital for twelve days," such that "the complaint . . . must be taken to admit that Mrs. Robertson actually received stabilizing treatment in accord with EMTALA for twelve days following her admission . . . ." *Id.* at 353.

Here, in Williams's view, he "was forced to languish without receiving *any* treatment of his [emergency medical condition] while PGHC awaited the uncertain arrival of its vascular and orthopedic surgeons, rather than transfer him to a Level I Trauma Facility where he would have received the requisite surgery." Pl.'s Opp'n 3. It is true that "a failure to provide necessary surgery may result in a failure to stabilize." *Williams*, 2017 WL 5668217, at *8–9. The Hospital counters that, regardless what treatment Williams initially received, it fulfilled its EMTALA duty simply by admitting Williams, which put the adequacy of his treatment within the purview of state medical malpractice law. Def.'s Mem. 6, 8, 13.

As discussed, while the *Bryan* Court addressed EMTALA liability with regard to a patient who had been admitted, it couched the hospital's satisfaction of the EMTALA

9

requirements only in terms whether the hospital provided stabilizing treatment, not whether it admitted the patient. 95 F.3d at 351. But, seven years later, in 2003, the Centers for Medicare & Medicaid Services ("CMS") issued a Final Rule to "clarif[y] policies relating to the responsibilities of Medicare-participating hospitals in treating individuals with emergency medical conditions who present to a hospital under the provisions of . . . EMTALA[]," and that Final Rule provides guidance on the "[a]pplicability of EMTALA to [i]npatients." *See* CMS Final Rule, 68 F.R. 53222-01, 2003 WL 22074670, at *53222 (F.R. Sept. 9, 2003). CMS considered cases, including *Bryan*, addressing "EMTALA applicability to admitted emergency patients," and noted that, "[i]n several instances, the courts concluded that a hospital's obligations under EMTALA end at the time that a hospital admits an individual to the facility as an inpatient." CMS Final Rule, 2003 WL 22074670, at *53244 (citing *Bryan*, 95 F.3d 349; *Bryant*, 289 F.3d 1162; *Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002)). CMS observed:

> In particular, the courts found that the statute requires that stabilizing care must be provided in a way that avoids material deterioration of an individual's medical condition if the individual is being transferred from the facility. The courts gave great weight to the fact that *hospitals have a discrete obligation to stabilize the condition of an individual when moving that individual out of the hospital to either another facility or to his or her home as part of the discharge process. Thus,* ***should a hospital determine that it would be better to admit the individual as an inpatient, such a decision would not result in either a transfer or a discharge, and, consequently, the hospital would not have an obligation to stabilize under EMTALA***.

*Id.* (emphasis added). It noted that this limitation on EMTALA liability is not an absolute bar to patients' recovery for negligent treatment:

> The courts have generally acknowledged that this limitation on the scope of the stabilization requirement does not protect hospitals from challenges to the decisions they make about patient care; only that redress may lie outside EMTALA. For example, a hospital may face liability for negligent behavior that results in harm to persons it treat after they are admitted as inpatients, but such potential liability would flow from medical malpractice principles, not from the hospital's obligations under EMTALA.

*Id.*

CMS concluded that "hospital obligations under EMTALA . . . end[] once the individuals are admitted to the hospital inpatient care," provided that the hospital does not "ostensibly 'admit[]' a patient, with no intention of treating the patient, and then inappropriately transferring or discharging the patient without having met the stabilization requirement." *Id.* at *53244–45. Under such circumstances, "liability under EMTALA may attach." *Id.* at *53245. Thus, "EMTALA *does not apply to individuals who have been admitted* in good faith to inpatient sections of the hospital, regardless of whether the individuals are experiencing emergency medical conditions." *Id*. (emphasis added).

In this regard, cases from other districts are informative. In *Hollinger v. Reading Health Systems*, the United States District Court for the Eastern District of Pennsylvania "consider[ed] in-patient admission a defense to EMTALA liability permitted that admission was not a deliberate effort to avoid EMTALA obligations," reasoning that "[t]o do otherwise would be to thwart the legislative intent behind EMTALA and would set courts on the slippery slope of evaluating every medical decision through the lens of EMTALA." No. 15-5249, 2016 WL 3762987, at *9 (E.D. Pa. July 14, 2016). It relied on *Mazurkiewicz v. Doylestown Hospital*, 305 F. Supp. 2d 437 (E.D. Pa. 2004), noting:

> In *Mazurkiewicz,* the plaintiff arrived at the emergency department of Doylestown Hospital with signs indicative of a right peritonsilar abscess. *Mazurkiewicz*, 305 F. Supp. 2d at 439. The plaintiff was hospitalized for five days after which he was discharged. Within twelve hours of his discharge, the plaintiff's condition worsened and the plaintiff went to another hospital's emergency department where he had to undergo emergency surgery. The plaintiff filed a claim under EMTALA seeking to hold the first hospital liable because he had an emergency medical condition that was not "stabilized" prior to his discharge. The *Mazurkiewicz* court examined case law from the Ninth, Fourth and Eleventh Circuits which declared that EMTALA failure to stabilize claims were not viable where the plaintiff was admitted into the hospital. *Bryan* 95 F.3d at 349; *Bryant*,

>>289 F.3d 1162; *Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002). The *Mazurkiewicz* court weighed the decisions of the Ninth, Fourth and Eleventh Circuits with case law from the Sixth Circuit holding that "once a patient is found to suffer from an emergency medical condition in the emergency room, she cannot be discharged until the condition is stabilized, regardless of whether the patient stays in the emergency room." *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131 (6th Cir. 1990). Ultimately, the *Mazurkiewicz* court adopted the reasoning of the Ninth, Fourth and Eleventh Circuits. The *Mazurkiewicz* court dismissed the plaintiff's EMTALA claim concluding that the most "persuasive synthesis" of the case law, the legislative history of EMTALA and the statutory language is that "admission [of a patient] is a defense so long as admission is not subterfuge." *Mazurkiewicz*, 305 F. Supp. 2d at 447.

*Hollinger*, 2016 WL 3762987, at *8.

Likewise, in *Langston v. Milton S. Hershey Medical Center*, the plaintiff did not deny that she was admitted to the defendant hospital when she arrived, a point that the United States District Court for the Middle District of Pennsylvania found "crucial." No. 15-CV-2027, 2016 WL 4366960, at *10 (M.D. Pa. Aug. 16, 2016), *recons. denied sub nom. Langston v. Hershey Med. Ctr.*, No. 15-CV-2027, 2016 WL 6780702 (M.D. Pa. Nov. 16, 2016). The court held that admission of the patient-plaintiff to the defendant-hospital is "a defense to EMTALA liability permitted that [the] admission was not a deliberate effort [by the hospital] to avoid EMTALA obligations." *Id.* (quoting *Hollinger*, 2016 WL 3762987, at *9 (citing *Mazurkiewicz*, 305 F. Supp. 2d at 447)). And, in *Morgan v. North Mississippi Medical Center, Inc.*, the United States District Court for the Southern District of Alabama stated that "[a] straightforward reading of [42 C.F.R. § 489.24(d)(2)(i)] is that admission of an individual as an inpatient is a complete defense to an EMTALA failure-to-stabilize claim, provided that the hospital does so in good faith in order to stabilize the emergency condition." 458 F. Supp. 2d 1341, 1350 (S.D. Ala. 2006), *aff'd*, 225 F. App'x 828 (11th Cir. 2007).

Indeed, considering the statute's purpose—to prevent hospitals from dumping patients—it is logical that a hospital can "satisf[y] its special responsibilities" by admitting a patient for

12

treatment rather than discontinuing treatment. *See* 42 C.F.R. § 489.24(d)(2)(i); *Brooks*, 996 F.2d at 710; *Bryan*, 95 F.3d at 351; *Vickers*, 78 F.3d at 142. At that point, it has committed to providing care to the individual seeking care, which is the "limited duty" that EMTALA imposes. *Vickers*, 78 F.3d at 142; *Brooks*, 996 F.2d at 715. Having done so, although the hospital may provide negligent care and subject itself to liability under state medical malpractice law, it has not refused to provide care and escaped the reach of a negligence claim under state law. *See Bryan*, 95 F.3d at 351 (noting that "traditional medical malpractice law affords no claim for failure to treat").

As noted, the record establishes that the Hospital admitted Williams on May 3, 2016. This admission is a complete defense to EMTALA liability unless Williams can show that he was not admitted in good faith. *See* 42 C.F.R. § 489.24(d)(2)(i); CMS Final Rule, 2003 WL 22074670, at *53244; *Langston*, 2016 WL 4366960, at *10, *Hollinger*, 2016 WL 3762987, at *9; *Morgan*, 458 F. Supp. 2d at 1350; *Mazurkiewicz*, 305 F. Supp. 2d at 447; *see also Bryan*, 95 F.3d at 350–52. Certainly, Williams argues that "PGHC's efforts were all stalling/delay tactics to cover up the fact that Defendant's on-call vascular and orthopedic surgeons were 'no shows,' and PGHC's trauma surgeon refused to take Williams to the OR," suggesting a lack of good faith (as Plaintiff sees it) in his initial treatment. Pl.'s Opp'n 12; *see id.* at 3 ("Williams was forced to languish without receiving *any* treatment of his [emergency medical condition] while PGHC awaited the uncertain arrival of its vascular and orthopedic surgeons, rather than transfer him to a Level I Trauma Facility where he would have received the requisite surgery."). But, the evidence establishes that surgery began within four hours of Williams's arrival, and he was admitted that same day and then treated for more than a week. Williams does not argue, let alone demonstrate, that his treatment over the course of those eleven days was not a good faith

effort to stabilize his emergency condition; he simply argues that the Hospital's efforts began too late. *See* Pl.'s Opp'n 1–2, 3, 9, 12. Thus, Williams cannot rely on any delay in performing his surgery to demonstrate that he was not admitted in good faith to continue stabilizing his emergency medical condition. *See Bryant v. Adventist Health Sys. N.*, 289 F.3d 1162, 1169 (9th Cir. 2002) (stating that it is the patient's burden to show that admission "was a ruse to avoid EMTALA's requirements"). Therefore, Williams cannot prevail on his EMTALA claim for failure to stabilize because he has not shown that he was not admitted in good faith to stabilize his emergency medical condition. *See* 42 C.F.R. § 489.24(d)(2)(i); CMS Final Rule, 2003 WL 22074670, at *53244; *Langston*, 2016 WL 4366960, at *10, *Hollinger*, 2016 WL 3762987, at *9; *Morgan*, 458 F. Supp. 2d at 1350; *Mazurkiewicz*, 305 F. Supp. 2d at 447; *see also Bryan*, 95 F.3d at 350–52. I will grant summary judgment in the Hospital's favor.

## **ORDER**

Accordingly, it is, this  30th   day of May, 2018, hereby ORDERED that

1. The Hospital's Motion, ECF No. 34, IS GRANTED;

2. Judgment IS GRANTED in the Hospital's favor; and

3. The Clerk SHALL CLOSE this case.

/S/
Paul W. Grimm
United States District Judge